IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MANDI NITSOS,                                                CV. 04-1494 KI

           Plaintiff,                                  OPINION AND ORDER

     v.

JOANNE B. BARNHART
Commissioner of Social Security,

           Defendant.

KING, Judge:

## INTRODUCTION

Plaintiff Mandi Nitsos brings this action pursuant to the Social Security Act, 42 USC § 405(g)("the Act"), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for Supplemental Security Income ("SSI") benefits. For the reasons set forth below, I reverse the decision of the Commissioner.

/ / /

/ / /

## PROCEDURAL BACKGROUND

Nitsos protectively filed an application for benefits on April 19, 2001, alleging disability since June 27, 2000, due to organic cognitive disorder from severe intracranial injury. Her application was denied initially and upon reconsideration. On January 13, 2003, a hearing was held before an Administrative Law Judge (ALJ). In a decision dated March 10, 2003, the ALJ found Nitsos was entitled to benefits from the date of her injury until January 1, 2001. On September 14, 2004, the Appeals Council denied Nitsos's request for review, making the ALJ's decision the final decision of the Commissioner. Nitsos now seeks judicial review of the Commissioner's decision.

## STANDARDS

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert. denied*, 517 US 1122 (1996). The Commissioner bears the burden of developing the record. *DeLorme v. Sullivan*, 924 F2d 841, 849 (9th Cir 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 USC § 405(g); *see also Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews*, 53

F3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986). The Commissioner's decision must be upheld, however, if "the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F3d at 1039-40.

## SEQUENTIAL EVALUATION FOR TERMINATION OF DISABILITY

The ALJ engages in a seven-step sequential inquiry to determine whether a claimant's disability has ended. 20 CFR § 416.994(b)(5)(i)-(vii).

Step One. The Commissioner determines whether the claimant has an impairment or combination of impairments that meet or equal the severity of an impairment set forth in the Listing of Impairments (the Listings) at 20 CFR pt. 404, subpt. P, app. 1. If so, claimant is disabled. If not, the Commissioner proceeds to evaluate claimant's case under step two. 20 CFR §§ 416.920(d), 416.994(b)(5)(i).

Step Two. The Commissioner determines whether there has been medical improvement in the claimant's condition. 20 CFR § 416.994(b)(5)(ii). Medical improvement is any decrease in the severity of the impairment present at the time claimant was disabled. 20 CFR § 416.994(b)(1)(i). If not, claimant is disabled. A determination that there has been a decrease in medical severity must be based on changes indicative of improvement in relation to symptoms, signs, or laboratory findings associated with the impairment. If the Commissioner determines that there has been medical improvement in the claimant's condition she proceeds to evaluate claimant's case under step three.

Step Three. The Commissioner determines whether claimant's medical improvement is related to the claimant's ability to perform work, that is, whether there has been an increase in

3 - OPINION AND ORDER

claimant's Residual Functional Capacity ("RFC")  If not, claimant is disabled.  If claimant's RFC has increased, the Commissioner proceeds to evaluate claimant's case under step four.  20 CFR §§ 416.994(b)(5)(iii).

<u>Step Four</u>.  If the Commissioner determines that there has been no medical improvement or that medical improvement is not related to the claimant's ability to work, then, at step four, the Commissioner determines whether the claimant's situation meets any of the special exceptions to medical improvement for determining that disability has ceased.  20 CFR § 416.994(b)(5)(iv).

<u>Step Five</u>.  If medical improvement, related to the claimant's ability to work, is shown, the Commissioner will determine whether the claimant's current impairments, in combination, are severe.  20 CFR § 416.994(b)(5)(v).  If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under step six.

<u>Step Six.</u>  The Commissioner determines whether claimant is able to perform work he or she has done in the past.  If so, claimant is not disabled.  If claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of claimant's case proceeds under step seven.  20 CFR § 416.994(b)(5)(vi).

<u>Step Seven</u>.  The Commissioner determines whether claimant is able to do any other work, given her age, education, work experience, and RFC.  20 CFR § 416.994(b)(5)(vii).  If not, claimant is disabled.  If the Commissioner finds claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates a significant number of jobs

exist in the national economy that claimant can do, claimant is not disabled. If the Commissioner does not meet this burden, claimant is disabled.

## ALJ's DECISION

At step one, the ALJ found that Nitsos's impairments did not meet or medically equal the criteria of any listed impairments. Tr. 24.

At step two, the ALJ found that Nitsos had made significant medical improvement since the onset of disability.

At step three, the ALJ determined that Nitsos's functional abilities related to her ability to work improved to the extent that she could lift ten pounds frequently and twenty pounds occasionally, and that she could sit for six hours in an eight hour workday and stand and/ or walk for six hours in an eight hour workday. The ALJ found that Nitsos should never climb ladders, ropes or scaffolds, and should avoid exposure to hazards. Tr. 26. The ALJ found that Nitsos's mental limitations had resolved to the degree that she was able to perform simple, routine, repetitive work that did not require public contact and did not require working as part of a team.

The ALJ's findings at steps two and three made consideration of the exceptions at step four unnecessary.

At step five, the ALJ determined that Nitsos had severe impairments of cognitive disorder and traumatic brain injury.

At step six, the ALJ found that Nitsos had not engaged in any substantial gainful activity in the past fifteen years and, thus, had no past relevant work.

At step seven, the ALJ found that Nitsos could perform other work that exists in the national economy, specifically assembler of small components, laundry worker, and produce sorter. Tr. 26.

## DISCUSSION

Nitsos was 19 years old at the time of the ALJ's decision, with an ninth grade education. The medical records accurately set forth Nitsos's medical history as it relates to her claim. The court has carefully reviewed the records, and the parties are familiar with them. Accordingly, the details will not be recounted here.

Nitsos contends that the ALJ erred by: (1) finding Nitsos not entirely credible; (2) rejecting the opinion of her treating physician; (3) finding that her impairments do not meet or equal in severity a listed impairment; (4) failing to credit lay witness testimony; (5) and improperly determining her RFC. Because the first two assertions are dispositive, the court need not address the latter three.

I. Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F3d 1035, 1039 (9th Cir 1995). However, the ALJ's findings must be supported by specific, cogent reasons. *Reddick v. Chater,* 157 F3d 715, 722 (9th Cir 1998). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear and convincing." *Id.* The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be substantial. *Reddick,* 157 F3d at 724. *See also Holohan v. Massinari,* 246 F3d 1195, 1208 (9th

Cir 2001). General findings (e.g., "record in general" indicates improvement) are an insufficient basis to support an adverse credibility determination. *Reddick* at 722; *see also Holohan,* 246 F.3d at 1208. The ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart,* 278 F3d 947, 958 (9th Cir 2002).

In deciding whether to accept a claimant's subjective symptom testimony, "an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms [footnote omitted.] *Smolen v. Chater,* 80 F3d 1273, 1281 (9th Cir 1996).

> Under the *Cotton* test, a claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged...." *Bunnell,* 947 F.2d at 344 (quoting 42 U.S.C. § 423(d)(5)(A)(1988)); *Cotton,* 799 F.2d at 1407-08. The *Cotton* test imposes only two requirements on the claimant: (l) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom. *Smolen*, 80 F.3d at 1282 (italics in original).

There is objective medical evidence that Nitsos suffers from an organic cognitive disorder arising from a motor vehicle accident in which she suffered an open head injury described as bilateral basilar skull fractures, scalp de-gloving and frontal temporal contusion with punctuate and diffuse axonal injury and white matter loss. Tr. 157, 320, 322. She was in a coma for 37 days, and has had 11 cranial surgeries. Tr. 355. These impairments could reasonably be expected to cause some degree of pain and other symptoms. Therefore, the ALJ may not simply reject Nitsos's symptom testimony. *Id* To determine whether Nitsos's testimony is credible the ALJ

7 - OPINION AND ORDER

may consider, for example: (l) ordinary techniques of credibility evaluation, such as a reputation for lying or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. *Smolen,* 80 F3d at 1284.

The ALJ stated:

> The claimant's statements concerning her impairments and their impact on her ability to work are generally credible in light of the reports of the treating and examining practitioners (20 C.F.R. § 404.1567). The examining and treating physicians have reported severe symptoms and limitations resulting from her impairments. The reported limitations are consistent with the claimant's subjective allegations during the closed period. Tr. 25.
> . . . .
> The medical evidence of record show [sic] there has been medical improvement in the claimant's impairments. The claimant testified by January 1, 2002, she was able to care for herself, her child, live independently and attend school. She continues to do so. Her exertional and non-exertional limitations have resolved to the degree she has regained the residual functional capacity to lift ten pounds frequently and twenty pounds occasionally. She can sit for about six hours in an eight hours [sic] workday and stand and/or walk for about six hours in an eight-hour workday. She should never climb ladders, ropes or scaffolds and should avoid exposure to hazards. Her mental limitations have resolved to the degree she is able to engage in simple, routine repetitive work with no public contact that does not require working as part of a team as the claimant works best by herself. Tr. 26.
> . . . .
> In reaching a conclusion regarding whether the claimant is disabled I have considered the assessments made by the State Agency physicians ....A different interpretation of the earlier records in conjunction with the new medical evidence and the credible testimony of the claimant, justifies a conclusion her impairments were more limiting than concluded by State Agency physicians during the closed period (SSR 96-6p). Tr. 27.

Nitsos testified that she dropped out of school in the tenth grade because she was pregnant. She worked as a bookkeeper for her aunt. Tr. 396. After her June 2000 accident

8 - OPINION AND ORDER

Nitsos and her son lived with her mother because Nitsos was unable to care for herself or her child. Tr. 397. In January 2002 Nitsos moved into an apartment because she wanted to become independent and to raise her son "how I want him raised." Tr. 398. Her grandmother visits her at least every other day "to make sure that we're okay." *Id.*

Nitsos has pain in the left frontal lobe and in the middle of her back. She has trouble sleeping. The "only thing that gets me up in the mornings is knowing I have to get my son up and ready to go to school." Tr. 399. She testified that she is extremely tired and drowsy during the day. Nitsos walks her son to his bus stop, then, two to four times a week, takes a bus to the Durham Center at Tigard High School, where she works for two hours on completing modified GED requirements. At the time of the hearing, she had been working on her GED for two years, and had failed all of the individual subject tests. Tr. 401.

Nitsos testified that she has no other activities outside of her home, and that she becomes "stressed out," anxious and angry in unfamiliar situations. Tr. 402. She does go to the grocery store about once a week, but usually gets only a few items. She gets frustrated trying to locate items and waiting in line. Nitsos stated that she gets "angry over really stupid little things, and I can't really help it or control my anger." Tr. 404. When she's not in school, Nitsos writes letters to her son's father and her mother, both of whom are in custody, or watches television. Sometimes she starts writing a letter, and then forgets about it, and does not finish the letter for several days. She cleans her house "a little bit at a time." Tr. 408.

Nitsos stated that it was taking so long to get her GED that she wanted to quit, but doesn't "because if I don't get an education and do something with my life, my son won't." Tr. 409. She testified that her memory is "horrible," and she can't remember what she read an hour before a

test. Tr. 410. She has trouble remembering where she has put things, like cleaning materials. Her son asks her for chocolate milk, and she will bring him juice because she can't remember what he asked for. She has medical certification to drive, but was suspended because she forgot to renew the certification. Tr. 412. Nitsos testified that light bothers her eyes, and that the light in the hearing room was so bright that she could not open her eyes all the way. Tr. 422. Light causes pressure in her head. Nitsos has a boyfriend who comes over about three times a week. They usually watch cartoons. Tr. 422.

The ALJ specifically found Nitsos credible, yet failed to credit her testimony regarding her fatigue, short-term memory deficit, anger management issues, and sensitivity to light. The ALJ did not identify what portions of Nitsos's testimony he found not credible, nor did he offer "clear and convincing" reasons why it was not credible. *Reddick,* 157 F3d at 724. Accordingly, the ALJ's implied rejection of Nitsos's symptom testimony is not supported by substantial evidence.

II. Treating Physician

If a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. *Holohan v. Massanari,* 246 F3d 1195, 1202 (9th Cir 2001); 20 CFR § 404.1527(d)(2). In general, the opinion of specialists concerning matters relating to their specialty are entitled to more weight than the opinions of nonspecialists. *Id.;* § 404.1527(d)(5). An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing" reasons supported by substantial evidence in the record. *Id.* at 1202, citing *Reddick v. Chater,* 157 F3d 715, 725 (9th Cir 1998). If the treating physician's

medical opinion is inconsistent with other substantial evidence in the record, treating source medical opinions are still entitled to deference and must be weighted using all the factors provided in 20 CFR 404.1527. *Id.* citing SSR 96-2p. An ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if she provides "specific and legitimate" reasons supported by substantial evidence in the record. *Id.*

Danielle L. Erb, M.D., treated Nitsos between July 21, 2000 and at least May 2003. In June, 2002, Dr. Erb noted that Nitsos was living independently with her son and attending school. She was taking Topamax to help prevent migraine headaches. Dr. Erb stated that Nitsos was "taking good care of herself. Appropriately attired. Clean, son is clean. They are getting along much better...Cognitively and emotionally has significantly improved." Tr. 365.

In January 2003, Dr. Erb noted that Nitsos's headaches had returned, her mood had declined, and she was not sleeping well. Dr. Erb prescribed Celexa for depression, and noted "I do believe that it would be appropriate for her to obtain disability." Tr. 364. Dr. Erb wrote:

> Alert, pleasant young woman who appears very fatigued. She has not been sleeping well. She continues to have slight asymmetry from the previous hemiparesis, but I am really pleased to see her continued cognitive improvements. She scheduled her own appt. She was early for the appt. and is cognitively making good progress. She still clearly has deficits, particularly in regards to fatigue and endurance, which is made worse by her poor sleep and mood. *Id.*

In March 2003, Dr. Erb reported that she had increased the dose of Celexa, and that Nitsos was "not as tearful." Tr. 389. Nitsos had quit smoking and her headaches had resolved.

By May 2003, Dr. Erb stated that Nitsos's depression and headaches had improved. She reported jogging, finishing her modified GED, and working with vocational rehabilitation. Tr. 388.

The ALJ stated:

> Records from Danielle Erb, M.D., revealed by June 10, 2002 the claimant was living independently with her son, providing his full-time care and attending school. She was noted to have been given permission to start driving and has been driving. Her cognitive and emotional functioning was noted to have had significantly improved with left hand function being significantly improved. Overall, Dr. Erb opined she was pleased with the claimant's continued cognitive improvements. Tr. 23.

The ALJ did not mention Dr. Erb's opinion that Nitsos was disabled, nor did he note Dr. Erb's assessment that Nitsos continued to have marked difficulties with fatigue and endurance. The Commissioner argues that the ALJ's RFC incorporated Dr. Erb's uncontradicted medical opinions. However, there is no reference in the ALJ's RFC analysis to limitations arising from fatigue or lack of endurance. Tr. 26.

III. Examining Physicians

Jeffrey D. Sher, Psy.D., examined Nitsos in June 2001. Although portions of the record are not legible, Dr. Sher diagnosed cognitive disorder, adjustment disorder with depressed mood, and possible personality change due to head injury. Dr. Sher assessed a GAF score of 50. Tr. 312. Dr. Sher detected deficits in memory, processing speed and executive functioning. He noted Nitsos's complaints of exhaustion and inability to sleep, and concluded that "[I]t appears that Ms. Nitsos has been disabled since the time of her accident until the present." Tr. 313.

Julia A. Wong-Ngan, Ph.D., a clinical neuropsychologist, examined Nitsos in December 2001. Tr. 315-18. Dr. Wong-Ngan diagnosed a cognitive disorder NOS, and found "mild to moderate impairment in memory functions, and moderate impairment in information processing

and visuomotor speed....These deficits are likely permanent." Tr. 318. Dr. Wong-Ngan concluded:

> While she likely had employment limitations even prior to the accident, given her low average intelligence, the added problems of memory and speed would hamper her employment potential further. I believe that she would have difficulty sustaining normal gainful employment. She may be able to do very simple and routine tasks, but speed would still be a factor. Accommodations would clearly have to be made. *Id.*

Dr. Wong-Ngan assessed a GAF score of 50.

The ALJ noted Dr. Wong-Ngan's report and her opinions, and he found Nitsos disabled as of the time of Wong-Ngan's examination. However, the ALJ did not explain why he impliedly rejected Wong-Ngan's opinions that Nitsos's memory, information processing, and speed deficits were moderate and permanent, and that she would have difficulty sustaining normal employment.

Sylvia L. Bullock, Psy. D., examined Nitsos on January 22, 2002. Tr. 350-56. Dr. Bullock concluded that Nitsos "appears to have adequate intellectual ability to complete her GED. However, memory testing...indicated that she would likely have difficulty acquiring new information given her mild to moderate memory impairment." Tr. 355. Dr. Bullock stated that Nitsos would need to proceed at a slower pace than others of similar intellectual ability, and found that her current academic skills were at the 4th through 7th grade level. Dr. Bullock opined that Nitsos had "adequate intellectual abilities that she should be successful in employment." *Id.*

/ / /

/ / /

/ / /

The ALJ stated:

> Sylvia L. Bullock, Psy.D., evaluated the claimant in January 2002, and reported intellectual testing revealed the claimant's overall cognitive ability was in the low average range and there was not significant difference between her verbal and performance IQ's. Her strengths were noted to be in the areas of vocabulary, attention to visual detail, perceptual organization and non-verbal reasoning with weaknesses in the areas of general fund of knowledge and visual motor coordination. Her achievement scores were all within the borderline ranges, but she was noted not [to] have a learning disorder and had adequate intellectual ability to complete her GED. Dr. Bullock further noted the claimant would likely do best in jobs that did not emphasize writing skills and did not require speed in performing reading tasks or math computations. She was able to interact well with others and would likely do well in customer service position[s] and in jobs that required use of her visual organization skills. However, her visual memory is more impaired than her auditory memory in that she would work well with visual material while it was in front of her, but would have a hard time remembering it once it was removed. Tr. 23.

The ALJ offers no reason for rejecting the uncontradicted opinions of Drs. Erb and Sher that Nitsos had limitations arising from fatigue and lack of endurance. These opinions are corroborated by Nitsos's testimony.

IV. Remand for Payment of Benefits is Appropriate

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir.), *cert. denied,* 531 U.S. 1038 (2000); *Benecke v. Barnhart,* No. 03-15155, 2004 WL 1770096 (9th Cir. Aug. 9, 2004). The court's decision turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not

sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989).

The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Harman v. Apfel,* 211 F.3d at 1178. The court should grant an immediate award of benefits when:

> (l) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id*

The second and third prongs of the test often merge into a single question: Whether the ALJ would have to award benefits if the case were remanded for further proceedings. *See id.* at 1178 n.2.

The ALJ improperly rejected the testimony of Nitsos and Drs. Erb, Sher and Wong-Nguyen as to Nitsos's mental and physical limitations. The VE testified that a person with the described limitations would be unable to sustain employment. Tr. . If credited, the claimant's testimony and the doctors' testimony, coupled with the testimony of the VE, establishes that Nitsos could not work on a regular and sustained full-time basis on January 1, 2001, and therefore, she was disabled. The ALJ's determination that Nitsos was capable of performing work on January 1, 2002 is not supported by substantial evidence.

The court, therefore concludes this matter should not be remanded for further proceedings. *See Schneider v. Comm'r,* 223 F.3d 968 (9th Cir. 2000). *See also Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998) ("We do not remand this case for further proceedings because it is clear from the administrative record that Claimant is entitled to benefits.")

## CONCLUSION

For these reasons, the Commissioner's decision should be reversed and remanded pursuant to sentence four of 42 USC § 405(g) for the calculation and award of disability benefits.

IT IS SO ORDERED.

Dated this ___24th___ day of October, 2005.

     ___/s/ Garr M. King___
     GARR M. KING
     United States District Judge